

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

MICHAEL PARR,

     Plaintiff,

     v.

THE CITY OF NEW YORK, NEW YORK
CITY POLICE OFFICER CONSTANTINOS
CHARIDEMOU, in his individual and official
capacities, NEW YORK CITY POLICE
SERGEANT COSMO LUBRANO, in his
individual and official capacities, and NEW
YORK CITY POLICE OFFICER JOHN DOE,
in his individual and official capacities,

     Defendants.

---

13 Civ. 520 (RA)(AJP)

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Michael Parr ("Plaintiff"), by and through his attorneys Latham & Watkins LLP,

for his complaint, alleges upon knowledge as to his own actions, and upon information and belief

as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.    Plaintiff, an 18-year-old African-American resident of the New York City

Housing Authority ("NYCHA") DeWitt Clinton Houses at 1760 Lexington Avenue, New York,

New York, brings this action against Defendants the City of New York (the "City"), New York

City Police Officer Constantinos Charidemou ("Defendant Charidemou"), New York City Police

Sergeant Cosmo Lubrano ("Defendant Lubrano"), and New York City Police Officer John Doe

(together with Defendant Charidemou and Defendant Lubrano, "Defendant Officers," and

collectively with the City, "Defendants"), to remedy Defendants' violation of Plaintiff's rights

secured by 42 U.S.C. § 1983; the Fourth and Fourteenth Amendments to the United States

Constitution; Title VI of the Civil Rights Act of 1964, 42. U.S.C. 2000(d); and the Constitution and laws of the State of New York.

2.     The City, operating through and in conjunction with the New York City Police Department ("NYPD"), has implemented and continues to conduct, enforce and sanction an unlawful vertical patrol policy and unlawful trespass arrest policies, practices and customs, which together result in a pattern and practice of illegal stops, seizures, questionings, searches and false arrests of residents of the NYCHA residences in violation of their state- and federally-protected constitutional and civil rights.

3.     A vertical patrol is a top-down walk-through patrol or sweep of hallways, stairwells, rooftops and landings, elevators and other common areas of a NYCHA building. Under the vertical patrol policy, NYPD officers establish roving pedestrian checkpoints in and around NYCHA residences, wherein they indiscriminately stop and question persons they observe, and unlawfully arrest individuals for trespass without probable cause.

4.     Plaintiff is a victim of Defendants' unlawful vertical patrol policy and unlawful trespass arrest policies, practices and customs. On August 15, 2010, Plaintiff—who was only sixteen years old at the time—left a friend's apartment in another building in the DeWitt Clinton Houses and was unlawfully arrested by Defendant Officers for trespass. A plain clothes officer, one of the Defendant Officers, stopped and questioned Plaintiff as he exited the stairwell of his friend's building. Plaintiff explained to the Defendant Officer that he was an invited guest of a building resident, and that his friend, whose apartment he just left, could confirm that fact. Plaintiff even provided the Defendant Officer the name of his friend, and offered to show the Defendant Officer to his friend's apartment. However, the Defendant Officer rejected Plaintiff's attempt to prove that he had a justifiable basis for being in the building. Instead, Plaintiff was

searched twice and handcuffed. While handcuffing Plaintiff's hands behind his back, one of the Defendant Officers pushed Plaintiff against the wall. The Defendant Officer's use of force against Plaintiff is documented in the NYPD's Unified Form 250 ("UF-250"), which states that the "Physical Force Used" during the arrest included, "Suspect Against Wall[,] Handcuffing Suspect." Although Defendant Officers lacked probable cause for the arrest, Plaintiff was placed into an unmarked police car and informed that he was being charged with trespass.

5.      While in the unmarked police car, Defendant Officers offered to release Plaintiff if he provided information about a homicide that occurred in the DeWitt Clinton House complex. Plaintiff had no knowledge of or connection to that homicide. Indeed, there existed no basis for linking Plaintiff to the homicide, except that it occurred near his home. Because Plaintiff did not have information about the homicide to offer the Defendant Officers, he was taken to the 23rd Precinct Police Station (the "23rd Precinct") where he was photographed, searched for a third time, fingerprinted, and processed.

6.      According to the charging documents, Plaintiff was arrested for one count of "Criminal Trespass in the 2nd Degree-DNA-Eligible MISD" and one count of "Criminal Trespass in the Third Degree."

7.      Plaintiff was placed in a holding cell at the 23rd Precinct, where he remained for approximately 1 to 2 hours before being released. Upon being released, Plaintiff was informed that he should expect a summons in the mail, requiring him to appear in court to defend against a charge of trespassing.

8.      Plaintiff was required to appear in court four times over a five-month period before the trespassing case was finally dismissed on March 9, 2011. Plaintiff's mother, Hattie Washington, had to miss work to accompany her son to his court appearances.

3

9.     The August 15, 2010 arrest was not the first time that Plaintiff was wrongfully stopped, seized, questioned, searched and arrested by NYPD officers.  Since the time he was approximately fourteen years old, NYPD officers have repeatedly and unjustifiably stopped, seized, questioned and searched Plaintiff while he was lawfully visiting friends in neighboring NYCHA buildings, or while walking through the apartment building in which he resides. Additionally, while out in the community, Plaintiff is frequently approached by NYPD officers, without reason or justification, who make it known to him and his companions that they are being watched.  Plaintiff is frequently asked by NYPD officers why he is in a particular place and/or where he is going.  Often times, the questioning is conducted by the same police officers who patrol Plaintiff's NYCHA apartment building.

10.     Plaintiff has been repeatedly stopped, seized, questioned and searched as a result of his race and place of residence in NYCHA public housing.  NYPD officers have consistently failed to establish a lawful basis for these stops, seizures, questionings and searches of Plaintiff.

11.     As a direct result of his August 15, 2010 arrest for trespassing, Plaintiff has restricted his daily activities.  Plaintiff is hesitant to leave his apartment because he does not wish to have further contact with the police.  Out of fear that he will again be stopped, seized, searched or arrested without cause, or worse, Plaintiff no longer visits his friend who lives in the building located at 1738 Lexington Avenue.  Plaintiff and his friend now only socialize out in the neighborhood, away from the NYCHA premises.  Plaintiff's relationship with his friend has been significantly affected by his inability to enter his friend's apartment building, which, like Plaintiff's building, is also part of the DeWitt Clinton Houses.  Additionally, Plaintiff is restricted in his lifestyle in that he no longer feels comfortable entering or exiting his building after 10 pm because the police often patrol the building at night.  Plaintiff notices the police

4

watching him as he goes about his daily activities, and he lives in constant fear of again being improperly stopped, searched or arrested.

12.     Plaintiff has suffered pain, humiliation, emotional distress, and loss of liberty as a result of his unlawful arrest by Defendant Officers of the NYPD. Plaintiff seeks compensatory damages; a declaration that Defendants' policies, practices and/or customs described herein violate Plaintiff's statutory and constitutional rights under federal and state law; attorneys' fees and costs, and such other relief as this court deems just and equitable.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of the claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and 1343(a)(4), as this action seeks redress for violations of Plaintiff's rights under the United States Constitution and federal civil rights laws.

14.     Plaintiff's claims for declaratory relief is authorized by 28 U.S.C. § 2201.

15.     This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the Plaintiff's claims under state law because they are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

16.     Venue is proper in the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(b), because the events that gave rise to the claims alleged in this complaint occurred in the County of New York, and pursuant to 28 U.S.C. § 1391(c), because Defendants conduct business and maintain their principal places of business in the County of New York.

## THE PLAINTIFF

17.     Plaintiff is an 18-year-old African-American resident of the NYCHA DeWitt Clinton Houses at 1760 Lexington Avenue, New York, New York. Plaintiff has resided at this address with his family, including his mother Hattie Washington, since birth.

## THE DEFENDANTS

18.     Defendant City is a municipal entity created and authorized under the laws of the State of New York. It is authorized under the laws of the State of New York to maintain, operate, and govern a police department, the NYPD, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The law enforcement activities of the NYPD are supported, in part, by federal funds.

19.     Defendant Charidemou, Shield 27883, was a police officer employed by the New York Police Department in the 23rd Precinct. At all times relevant hereto and in all actions described herein, Defendant Charidemou was acting under color of state law as a police officer, and in such capacity, as the agent, servant and employee of Defendant City of New York. On information and belief, Defendant Charidemou is one of the officers who improperly arrested Plaintiff for criminal trespass on the night of August 15, 2010.

20.     Defendant Cosmo Lubrano, shield number unknown, is a police sergeant employed by the New York Police Department in the 23rd Precinct. At all times relevant hereto and in all actions described herein, Defendant Lubrano was acting under color of state law as a police sergeant, and in such capacity, as the agent, servant and employee of Defendant City of New York. On information and belief, Defendant Lubrano participated in the improper arrest of Plaintiff for criminal trespass on the night of August 15, 2010.

21.    Defendant police officer John Doe is employed by the New York Police Department.  At all relevant times he was acting under color of state law as a police officer, and in such capacity, as the agent, servant and employee of Defendant City of New York.  On information and belief, Defendant police officer John Doe participated in the improper arrest of Plaintiff for criminal trespass on August 15, 2010.

## FACTS

### A.    The Unlawful Arrest Of Plaintiff By Defendant Officers.

22.    On the evening of August 15, 2010, at approximately 9:00 pm, Plaintiff went to visit a friend in a neighboring NYCHA apartment building located at 1738 Lexington Avenue. That building, as well as the building in which Plaintiff resides—1760 Lexington Avenue—is part of the DeWitt Clinton Houses.  Plaintiff spent approximately half an hour with his friend and then, attempting to return home in time for his mother's curfew, walked down the stairs of 1738 Lexington Avenue to leave the building.

23.    As soon as he exited the building stairwell, however, Plaintiff encountered a plain clothes police officer, one of the Defendant Officers.  The Defendant Officer said, "Stop right there, where you coming from?"  Plaintiff replied that he had been visiting a friend who lives in the building.  Plaintiff offered to show the Defendant Officer to his friend's apartment to corroborate his story, but the Defendant Officer responded "No, there's no need to do that." When Plaintiff asked the Defendant Officer why he had been stopped, the Defendant Officer did not answer.

24.    The Defendant Officer proceeded to search Plaintiff, removing his hat, lifting the cuffs of his pants, searching his pockets, and subjecting him to a pat-down.  Because Plaintiff intended to only briefly visit his friend and then immediately return home, his pockets were

7

empty.  As there was nothing hidden anywhere on Plaintiff's person, the search failed to produce any items.

26.     Despite the lack of findings from the search or any other reasonable basis for stopping and detaining Plaintiff, the Defendant Officer told Plaintiff that he had to remain in the lobby, and that he was not free to leave.  As he waited in the lobby, Plaintiff repeated that he was an invited guest of a resident of the building, and that the resident—his friend—could verify this. The Defendant Officer again refused to speak with Plaintiff's friend.  Plaintiff also asked if he could contact his mother to let her know that he was being arrested, but was denied that opportunity as well.

26.     Soon thereafter, another plain clothes Defendant Officer joined the first officer. While handcuffing Plaintiff's hands behind his back, one of the Defendant Officers pushed Plaintiff against the wall.  The Defendant Officer's use of force against Plaintiff is documented in the NYPD's UF-250, which states that the "Physical Force Used" during the arrest included, "Suspect Against Wall[,] Handcuffing Suspect."  The arresting officer, according to the arrest record, was Officer Constantinos Charidemou.  After asking again why he was being detained, Plaintiff was informed by the two Defendant Officers that he was being charged with trespass.

27.     Before putting Plaintiff in the unmarked police car, the Defendant Officers once again searched him, this time outside of the building, with many of his neighbors and friends looking on.

28.     In addition to the two arresting Defendant Officers, a third Defendant Officer rode with Plaintiff to the 23rd Precinct.  According to Defendants' initial disclosures, provided to Plaintiff on April 24, 2013 in accordance with Rule 26(a) of the Federal Rules of Civil Procedure, Sergeant Cosmo Lubrano likely has "discoverable information" about the events in

question.  Therefore, on information and belief, Sergeant Cosmo Lubrano was, at a minimum, one of the Defendant Officers who rode with Plaintiff to the 23rd Precinct.  While in the car, the Defendant Officers attempted to elicit information from Plaintiff about a homicide that took place in the DeWitt Clinton Houses.  When Plaintiff denied having knowledge of the incident, one of the Defendant Officers cursed at him and told him to "stop fucking lying."  One of the Defendant Officers then offered Plaintiff a "chance," assuring him that he would not be processed at the 23rd Precinct if he revealed information about the homicide.  Plaintiff repeated that he did not have any information about the homicide.  Indeed, there existed no basis for linking him to the homicide, except that it occurred near his home.

29.     Upon arriving at the 23rd Precinct, Plaintiff was photographed, searched again, fingerprinted, and placed in a holding cell.

30.     According to the charging documents, Plaintiff was arrested for one count of "Criminal Trespass in the 2nd Degree-DNA-Eligible MISD" and one count of "Criminal Trespass in the Third Degree."

31.     Plaintiff was granted one phone call, with which he unsuccessfully attempted to contact his mother.  Plaintiff's mother did not learn that her son had been arrested from either the Defendant Officers, any other police officer, or from Plaintiff.  Rather, she was informed by one of Plaintiff's friends, who had witnessed the arrest.

32.     When Plaintiff's mother called the 23rd Precinct, she was incorrectly told that her son was not there.  Meanwhile, one of the Defendant Officers informed Plaintiff that his mother knew he was being held at the 23rd Precinct.

33.     After spending approximately 1 to 2 hours at the 23rd Precinct, Plaintiff was permitted to leave, before his mother arrived.  Before leaving, however, one of the Defendant Officers warned him not to go back to the building located at 1738 Lexington Avenue.

34.     Plaintiff was required to appear in court four times over a five-month period before the case against him was ultimately dismissed on March 9, 2011.  Plaintiff's mother was required to miss work to accompany her son to these court appearances.

35.     As a direct result of the events of August 15, 2010 and the conduct of the Defendants, Plaintiff has restricted his daily activities.  Plaintiff is hesitant to leave his apartment because he does not wish to have further contact with the police.  Out of fear that he will again be improperly stopped, searched, seized or arrested, or worse, Plaintiff no longer visits his friend who lives in the building located at 1738 Lexington Avenue.  Plaintiff and his friend now only socialize out in the neighborhood, away from the NYCHA premises.  Plaintiff's relationship with his friend has been significantly affected by his inability to enter his friend's apartment building.  Additionally, Plaintiff is restricted in his lifestyle in that he no longer feels comfortable entering or exiting his building after 10 pm because the police often patrol the building at night.  Plaintiff notices the police watching him as he goes about his daily activities, and he lives in constant fear of being improperly stopped, searched, seized or arrested.  Plaintiff suffered pain, humiliation, emotional distress, and loss of liberty as a result of his unlawful arrest and Defendants' racially-motivated and discriminatory actions.

**B.      The NYPD's Vertical Patrol Policy.**

36.     The unlawful search and seizure of Plaintiff by the Defendant Officers was the direct result of the NYPD's policy, practice and custom of operating roving pedestrian checkpoints, otherwise known as "vertical patrols" or "vertical sweeps," in NYCHA residences.

37.     NYCHA fails to provide adequate building security and instead outsources its security obligations to the NYPD, designating the NYPD as its agent.  One of Defendants' primary trespass enforcement practices is the use of vertical patrols.  In the course of a vertical patrol, multiple NYPD officers approach anyone they observe in the common areas of a building and require them either to present identification proving their residency in the building or to affirmatively establish a connection to a specific building resident.  If an individual stopped and seized pursuant to a vertical patrol fails to identify himself to the satisfaction of the officer, or is unable to demonstrate to the satisfaction of the officer that he is going to, or coming from, his own residence or that of another tenant, he is arrested for trespass.  If the individual has not already been searched for contraband pursuant to the seizure, he is subjected to a search for contraband pursuant to his arrest.

38.     When they effectuate trespass arrests, NYPD officers sometimes complete supporting depositions which, on information and belief, the District Attorney's offices have requested.  The supporting deposition substantiates the basis for the officer's initial approach and memorializes factual information from which a probable cause determination can be made.  The arresting officer checks as applicable from a list of standard bases for trespass arrests, such as: (a) person admitted he or she was not a resident and did not know the surname or apartment number of a tenant; (b) person identified the resident and apartment he or she was visiting but the officer could not locate the resident; or (c) person gave no reason, is not on the tenant roster, and the officer could not locate anyone who gave him permission to enter.

C.    **The City's Trespass Enforcement Policies, Practices And Customers Are Unlawful.**

39.     The NYPD's trespass enforcement policies and practices constitute a custom and practice wherein officers stop and question persons they observe without sufficient legal basis, seize

11

persons without reasonable suspicion, and unlawfully arrest individuals for trespass without probable cause.

40.     The NYPD reported that from May 2008 through April 2009, it conducted over 225,000 vertical patrols in NYCHA Residences.  Law-abiding residents and their family and friends are repeatedly subject to stops, seizures, questioning, frisks, searches, and/or arrests in connection with unlawful trespass enforcement policies and practices.

41.     NYPD officers have characterized the lobbies of NYCHA Residences as a "well," or a ready source of subjects to stop, question, and frisk.  These encounters, reported in the NYPD's UF-250, are one of the NYPD's indicators of productivity.  The UF-250 is a mandatory police reporting form that serves to create a record of important aspects of stop-and-frisk encounters. According to one former officer, "Once they walk into the building, every UF-250 can come from a do-not-enter, meaning entering without a key. . . . But once you ask them for an ID, 90% of the people live in the building.  That's why the arrest rate is so low.  They're not acting suspiciously, but ...they don't have a key to enter."  Rivera, Baker, and Roberts, A Few Blocks, 4 Years, 52,000 Police Stops, N.Y. Times, July 11, 2010, at AL.

42.     Recordings of officers from the 81st Precinct confirm these practices.  When discussing a NYCHA building at 120 Chauncey Street in Brooklyn, NYPD officers were told that "no one walks out, out there without being stopped, all right?  Nobody.... You ask everybody, 'You live here?  Let me see ID.'  You grab everybody.  They get zero tolerance."  81st Precinct Recordings, produced in the matter of *Floyd, et al. v. City of New York, et al.*, 08 Civ. 01034 (SAS) ("81st Precinct Recordings"), December 2008.

43.     In these recordings, officers also describe criminal trespass as an easy means of increasing arrest percentages by arresting more individuals.  An NYPD sergeant was recorded stating that "if they don't belong in Stuy Gardens or any housing buildings, you can lock them up for

criminal trespass, all right? If they give you a story about my aunt lives in the third floor, well you're not with your aunt, okay?" 81st Precinct Recordings, November 2008.

44.    On January 19, 2009, an NYPD sergeant told officers that arresting people for trespass is a way to arrest people who are suspected of committing other crimes. 81st Precinct Recordings, January 2009.

45.    According to a survey conducted in 2007 and 2008 by New York Lawyers for the Public Interest in the Thomas Jefferson Houses in East Harlem and the Walt Whitman Houses in Fort Greene, Brooklyn, large numbers of NYCHA residents have been subjected to stops, frisks and/or arrests for trespass. 72% of households in the Thomas Jefferson Houses reported that they and their regular visitors had been stopped by police regularly or repeatedly in the previous year. 30% of participating NYCHA households included a person who had been charged with trespassing.

46.    Between 2004 and 2008, stops on suspicion of trespass on NYCHA Residences increased almost 50% and trespass arrests in NYCHA Residences increased 36%. The City has not provided any legitimate and neutral explanation for this rise in the stop and arrest rates.

47.    According to a review by the Civilian Complaint Report Board ("CCRB") of its files, the substantiation rate for complaints of unlawful stops and frisks in public housing is three times higher than similar complaints from non-NYCHA locations. The CCRB has met with the NYPD to discuss the rise in allegations of improper stops in and around NYCHA buildings.

48.    According to the CCRB, the number of complaints received by the CCRB regarding unjustified stops and frisks comprises roughly 30% of the complaints received by the CCRB. In 1999, there were 1,240 complaints for unjustified stops and frisks. That number increased to 5,089 in 2006. Based on New York State data, from 2005 to 2008, prosecutors declined to press charges in 11.2% of all trespass arrests in New York City. Among the nineteen highest-volume crimes, trespass has the fifth-highest declination rate.

49.     In a November 2010 court hearing, an NYPD officer testified that officers have "more leeway in their interactions" in NYCHA Residences and can "question anyone they encounter to determine whether they are on the premises lawfully." Based on the officer's full testimony, the Court found the evidence to suggest that it was the NYPD's practice to "routinely engage in random, unjustified questioning" on NYCHA properties, in systemic violation of the law. *People v. Ventura*, 913 N.Y.S.2d 543, 545, 546–47 (N.Y. Sup. Ct. 2010).

50.     Defendants have long been aware that their trespass enforcement policies and practices are unlawful. Since at least 2007, numerous court decisions, reports, and newspaper articles have publicly identified the Defendants' unlawful policies and practices.

51.     Residents of NYCHA are unable to use and enjoy their residences because Defendants' vertical patrol policy and trespass arrest policies, practices and customs are implemented in such a consistently unlawful and disproportionate manner that the residents are not free to come and go as they wish and their family, friends, and guests are constantly harassed and intimidated by NYPD officers.

52.     In 2009, NYCHA tenant leaders delivered a statement to NYPD Commissioner Raymond Kelly critiquing NYPD trespass enforcement and noting that residents feel like they live in "penal colonies." Citywide Council of Presidents of NYCHA, *The Public Housing Police and Public Housing Resident Perceptions* (Nov. 30, 2009).

**D.     Defendants Failed To Remedy The Problem.**

53.     The NYPD Patrol Guide ("Patrol Guide") provision on vertical patrols in NYCHA Residences, Patrol Guide 212-60, which was in effect until June 8, 2010, directed uniformed patrol officers to "take note of unauthorized persons remaining in lobbies, basements, stair cases and roof landings, and take appropriate police action when necessary." The Patrol Guide included no criteria for determining who is—and who is not—an "unauthorized person,"

14

and provided insufficient guidance for the grounds on which a person can lawfully be stopped, seized, questioned, frisked, searched, or arrested for trespass.

54. On June 8, 2010, the NYPD issued Interim Order 23 to "provide additional guidance concerning situations occurring within Housing Authority facilities." While Interim Order 23 officially "suspended" Patrol Guide 212-60, "Interior Vertical Patrol of Housing Authority Buildings," it provided little or no relief from the unlawful and entrenched practices to which NYCHA residents and their guests have been subjected for several years.

55. Defendants' vertical patrol policy, as implemented by NYPD officers, does not require an arresting officer to act upon observed behavior that reliably differentiates a suspected trespasser or "unauthorized person" in a NYCHA hallway from a lawful visitor in transit or a building resident enjoying the common area of his own home. Interim Order 23 simply directs uniformed patrol officers to "[b]e alert for persons who may be violating House Authority rules and regulations, including potentially unauthorized persons within NYCHA property." Yet Interim Order 23 contains no criteria for determining who is and who is not an "unauthorized person." Given the large number of people legally permitted in a NYCHA residence, a police officer who is unfamiliar with building residents and visitors cannot consistently or reliably differentiate between a suspected trespasser and a building resident, visitor, permitted, or licensee based on this policy.

56. Moreover, the UF-250 merely requires that an officer select factors contributing to "reasonable suspicion" from a standardized list, including "Fits Description," "Wearing Clothes/Disguises Commonly Used in Commission of Crime," and "Furtive Movements." An officer is not required to identify individualized, objective facts supporting suspicion that criminal activity is afoot. The lack of specificity required on the part of the police officers is

15

reflective of, and consistent with, Defendants' practice and custom of indiscriminately stopping, questioning, and seizing every person observed in NYCHA residences without individualized reasonable suspicion.

57.    Defendants' vertical patrol policy, even if diligently followed, causes a pattern and practice of false arrests of many people who are lawfully on the premises.  Despite the lack of probable cause to suspect criminal activity, individuals are forced to present documents and/or witnesses at the time of arrest in order to overcome a presumption of guilt.

**E.    Defendants' Vertical Patrol Policy And Trespass Arrest Practices Are Racially Discriminatory.**

58.    Defendants have chosen to enforce the vertical patrol policy and trespass arrest policies, practices and customs in an intentionally discriminatory and race-based manner by focusing vertical patrols and trespass arrests on communities of color.  Because the vertical patrols and trespass arrests occur primarily in communities of color, such as NYCHA residences, historically entrenched racial segregation ensures that African Americans and Latinos will bear the brunt of Defendants' unlawful actions.

59.    According to demographic data maintained by NYCHA, over 95% of NYCHA residents are nonwhite.  As such, Defendants' policies, practices, and customs have a disproportionate impact on African Americans and Latinos, despite the fact that African Americans and Latinos constitute only 54% of the city's population.

60.    The rate of trespass stops, arrests, and enforcement in predominantly minority NYCHA residences is, on average, three times higher than surrounding areas with similar rates of crime.  The decision to enforce trespass laws in this disproportionate way is not explained or justified by underlying crime levels in NYCHA residences.  Moreover, where predominantly minority NYCHA residences are located in predominantly white or gentrifying neighborhoods,

the disparities in trespass arrest rates increase even further. This remains true after controlling for other relevant factors.

61.     Within NYCHA residences, African Americans are stopped on suspicion of trespass 2 ½ times more often than Caucasians, and have over a 25% greater chance of being arrested for trespass than Caucasians.

62.     These disparities are the result of a unique and separate enforcement process consistent with intentional targeting based on race. Essentially, the enforcement practices in NYCHA residences are not related to the enforcement practices in the surrounding areas.

63.     Defendants are aware of these constitutional violations and the disparate impact on minority residents of NYCHA and their visitors. New York City Council members have noted publicly the persistence of unlawful trespass enforcement policies and practices in NYCHA residences. In one instance, the Chair of the Public Housing Committee criticized the NYPD for indiscriminate use of stop and frisk tactics in NYCHA residences and for targeting people in public housing because of where they lived and because of their race. Nevertheless, Defendants allow the constitutional violations to persist because of the race, ethnicity, and/or national origin of NYCHA residents and visitors. Further, the City does not pursue similar law enforcement policies, practices, or customs, or permit similar levels of constitutional violations by NYPD officers in predominantly Caucasian communities.

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF THE FOURTH AMENDMENT OF THE UNITED STATES CONSTITUTION, FALSE ARREST

64.     Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 63 above.

17

65.     Acting under color of state law, Defendant Officers unlawfully, unjustifiably and intentionally detained, arrested, and imprisoned Plaintiff, depriving him of his liberty against his will. At no time did Plaintiff consent to the confinement. Defendant Officers intentionally and recklessly deprived Plaintiff of his rights secured by the Fourth Amendment to the United States Constitution.

66.     The unjustifiable and unlawful stop, seizure, questioning, searches, arrest, and imprisonment of Plaintiff was carried out without a warrant and without probable cause.

67.     Because the false arrest and imprisonment of Plaintiff occurred without a warrant and without probable cause, the conduct was not privileged or subject to a claim of qualified immunity. Defendant Officers should have known that Plaintiff's actions did not provide probable cause to arrest. Defendant Officers did not act in an objectively reasonable manner and violated Plaintiff's clearly established rights under the Constitution of the United States by detaining, arresting and imprisoning Plaintiff without probable cause.

68.     The constitutional abuse and violation suffered by Plaintiff was directly and proximately caused by the policies, practices and customs devised, implemented, enforced, encouraged and sanctioned by the City, to wit: the City's vertical patrol policy and trespass enforcement policies, practices and customs, which involve systematic stopping, seizing, questioning, and searching of any and all persons observed in common areas of NYCHA residences absent individualized suspicion and the improper arrests of individuals in common areas of NYCHA residences absent warrants or probable cause.

69.     All of the foregoing occurred without any fault on the part of Plaintiff.

70.     Plaintiff has suffered injuries that were proximately caused by Defendants' actions. Defendants have acted with deliberate indifference to Plaintiff's Fourth Amendment

18

rights.  As a direct and proximate result of the acts and omissions of Defendants, Plaintiff has

been deprived of his rights under the Fourth Amendment to the United States Constitution and

42 U.S.C. § 1983.

## COUNT II
## VIOLATIONS OF THE FOURTH AMENDMENT OF THE UNITED STATES CONSTITUTION, UNLAWFUL STOP AND SEIZURE

71.    Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 70

above.

72.    Acting under color of state law, Defendant Officers unlawfully stopped, seized,

questioned, and searched Plaintiff, and in doing so intentionally and recklessly deprived Plaintiff

of his rights secured by the Fourth Amendment to the United States Constitution.

73.    Defendant Officers violated Plaintiff's clearly established rights under the

Constitution of the United States of which a reasonable police officer would have known.

Defendant Officers should have known that Plaintiff's actions did not give rise to a reasonable

suspicion of wrongdoing, and as a result, the police officers should have known that they did not

have the authority to stop, seize, question, or search Plaintiff.  Defendant Officers did not act in

an objectively reasonable manner and violated clearly established federal laws.

74.    The constitutional abuse and violation suffered by Plaintiff was directly and

proximately caused by the policies, practices and customs devised, implemented, enforced,

encouraged and sanctioned by the City, to wit:  the City's vertical patrol policy and trespass

enforcement policies, practices and customs, which involve systematic stopping, seizing,

questioning, and searching of any and all persons observed in common areas of NYCHA

residences absent individualized suspicion and the improper arrests of individuals in common

areas of NYCHA residences absent warrants or probable cause.

19

75. By adopting and implementing the vertical patrol policy and trespass arrest polices, practices and customs in this manner, the City has enforced, promoted, encouraged and sanctioned a policy, practice and/or custom of (i) roving pedestrian checkpoints for general crime control wherein NYPD officers indiscriminately stop and seize individuals in the absence of objective, individual criteria in violation of the Fourth Amendment to the United States Constitution, and (ii) stopping, seizing, questioning and searching residents without the reasonable articulable suspicion of criminality required by the Fourth Amendment to the United States Constitution.

76. Plaintiff has suffered injuries that were proximately caused by Defendants' actions.

77. Defendants have acted with deliberate indifference to Plaintiff's Fourth Amendment rights. As a direct and proximate result of the acts and omissions of Defendants, Plaintiff has been deprived of his rights under the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983.

## COUNT III
## VIOLATIONS OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION

78. Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 77 above.

79. Acting under color of state law, Defendants applied the vertical patrol policy and trespass arrest policies, practices and customs against Plaintiff in an intentionally discriminatory and race-based manner. Defendants have focused enforcement of the vertical patrol policy and trespass arrest policies, practices and customs in African-American and Latino communities.

20

80.     Defendants have targeted communities of color, such as NYCHA residences, for focused implementation of vertical patrols and trespass arrest enforcement, as residents in, and visitors to, these buildings are almost entirely African Americans and Latinos.  This pattern of targeted enforcement is not explained or justified by underlying crime rates in NYCHA residences.

81.     As a result of Defendants' targeted implementation, Defendants' vertical patrol policy and trespass arrest policies, practices and customs have a disparate impact on African-American and Latino individuals.

82.     Defendants have acquiesced in, ratified, and failed to monitor widespread violations of the constitutional rights of African Americans and Latinos to be free from unreasonable searches and seizures as well as false arrests, on the basis of race.

83.     These constitutional abuses were and are directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged, and sanctioned by the City.

84.     Because Defendants have applied the vertical patrol policy and trespass arrest policies, practices and customs against Plaintiff in an intentionally discriminatory and race-based manner, the conduct was not privileged or subject to a claim of qualified immunity.  Defendant Officers did not act in an objectively reasonable manner and violated Plaintiff's clearly established rights under the Constitution of the United States by targeting Plaintiff on the basis of his race.

85.     Plaintiff has suffered injuries that were proximately caused by Defendants' actions.

21

86. As a direct and proximate result of Defendants' practices, policies and customs, Plaintiff has been deprived of his right to Equal Protection of the laws under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

## COUNT IV
### VIOLATIONS OF THE DUE PROCESS CLAUSE
### OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION

87. Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 86 above.

88. Acting under color of state law, Defendant Officers intentionally and recklessly violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution, by unlawfully stopping, seizing, questioning, frisking, searching, and arresting Plaintiff, thereby depriving Plaintiff of his right to freedom of association, freedom of assembly, and intimate association, in the absence of constitutionally required procedural protections.

89. The constitutional abuse and violation suffered by Plaintiff was directly and proximately caused by the policies, practices and customs devised, implemented, enforced, encouraged and sanctioned by the City, to wit:  the City's vertical patrol policy and trespass enforcement policies, practices and customs, which involve systematic stopping, seizing, questioning, and searching of any and all persons observed in common areas of NYCHA residences absent individualized suspicion and the improper arrests of individuals in common areas of NYCHA residences absent warrants or probable cause.

90. Plaintiff has suffered injuries that were proximately caused by Defendants' actions.

91. Defendants have acted with deliberate indifference to Plaintiff's Fourteenth Amendment Rights.  As a direct and proximate result of Defendants' practices, Plaintiff has been

deprived of his right to due process under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

## COUNT V
## VIOLATIONS OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000(d)

92.     Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 91 above.

93.     The law enforcement activities of the NYPD are supported in part by federal funds.

94.     Acting under color of state law, Defendants applied the vertical patrol policy and trespass arrest policies, practices and customs against Plaintiff in an intentionally discriminatory and race-based manner.  Defendants have focused enforcement of the vertical patrol policy and trespass arrest policies, practices and customs in African-American and Latino communities.

95.     Defendants have targeted communities of color, such as NYCHA residences, for focused implementation of vertical patrols and trespass arrest enforcement, as residents in, and visitors to, these buildings are almost entirely African Americans and Latinos.  This pattern of targeted enforcement is not explained or justified by underlying crime rates in NYCHA residences.

96.     Defendants have acquiesced in, ratified, and failed to monitor widespread violations of the constitutional rights of African Americans and Latinos to be free from unreasonable searches and seizures as well as false arrests, on the basis of race.

97.     Plaintiff's injuries were directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged, and sanctioned by the City.

98.     Plaintiff is entitled to receive police protection from the NYPD, but he was instead victimized by the NYPD's unlawful and discriminatory police activities.  Defendants'

23

discriminatory practices prevented Plaintiff from receiving the full benefit of the programs and

activities of the NYPD, which are supported by federal funds.

99.     Because Defendants applied the vertical patrol policy and trespass arrest policies,

practices and customs against Plaintiff in an intentionally discriminatory and race-based manner,

the conduct was not privileged or subject to a claim of qualified immunity.  Defendant Officers

did not act in an objectively reasonable manner and violated Plaintiff's clearly established

federal rights by targeting Plaintiff on the basis of his race.

100.     As a direct and proximate result of Defendants' practices, Plaintiff has been

deprived of his right to be free from discrimination under federally assisted programs, on the

grounds of race, color, or national origin, under Title VI of the Civil Rights Act of 1964, 42

U.S.C. § 2000(d).

## COUNT VI
## VIOLATIONS OF THE NEW YORK STATE CONSTITUTION, ARTICLE 1, SECTION 11

101.     Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 100

above.

102.     Article 1, Section 11 of the Constitution of the State of New York provides that

"[n]o person shall be denied the equal protection of the laws of this state or any subdivision

thereof.  No person shall, because of race, color, creed or religion, be subjected to any

discrimination in his or her civil rights by any other person or by any firm, corporation, or

institution, or by the state or any agency or subdivision of the state."

103.     Defendants applied the vertical patrol policy and trespass arrest policies, practices

and customs against Plaintiff in an intentionally discriminatory and race-based manner.

Defendants have focused enforcement of the vertical patrol practices on African-American and Latino communities.

104.    Defendants have targeted communities of color such as NYCHA residences for focused implementation of vertical patrols because residents in, and visitors to, NYCHA residences are almost entirely African Americans and Latinos.

105.    As a result of Defendants' targeted implementation, Defendants' vertical patrol policy and trespass arrest policies, practices and customs have a disparate impact on African-American and Latino individuals, including Plaintiff.

106.    Defendants have acquiesced in, ratified, and failed to address widespread violations of Plaintiff's constitutional rights to be free from unreasonable searches and seizures, because of Plaintiff's race.

107.    These constitutional abuses were and are directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged, and sanctioned by the City.

108.    Because Defendants have applied the vertical patrol policy and trespass arrest policies, practices and customs against Plaintiff in an intentionally discriminatory and race-based manner, the conduct was not privileged or subject to a claim of qualified immunity.  Defendant Officers did not act in an objectively reasonable manner and violated Plaintiff's clearly established federal rights by targeting Plaintiff on the basis of his race.

109.    As a direct and proximate result of Defendants' practices, Plaintiff has been deprived of his right to equal protection of the laws under Article 1, Section 11 of the Constitution and the laws of the State of New York.

25

## COUNT VII
### VIOLATIONS OF THE NEW YORK STATE CONSTITUTION, ARTICLE 1, SECTION 12

110.    Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 109 above.

111.    Article 1, Section 12 of the Constitution of the State of New York provides that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation and particularly describing the place to be searched, and the persons or things to be seized...."

112.    Defendant Officers unlawfully stopped, seized, questioned, searched and arrested Plaintiff, depriving him of his rights secured by the Article 1, Section 12 of the Constitution of the State of New York.

113.    By adopting and implementing the vertical patrol policy and the trespass arrest policies, practices and customs in this manner, the City has enforced, promoted, encouraged and sanctioned a policy, practice and/or custom of (i) stopping and frisking African-American and Latino individuals without the reasonable articulable suspicion of criminality required by the Constitution and laws of the State of New York, and (ii) arresting African-American and Latino individuals without probable cause to establish that a criminal offense has been or is being committed as required by the Constitution and laws of New York.

114.    The constitutional abuse and violations suffered by Plaintiff were directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, promoted, encouraged and sanctioned by the City.

26

115.   As a direct and proximate result of the acts and omissions of the City, Plaintiff has been deprived of his rights under Article 1, Section 12 of the Constitution and the laws of the State of New York.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Michael Parr respectfully requests that this Court:

a)     Declare that the Defendants' acts, practices, policies and omissions have deprived Plaintiff of his rights under 42 U.S.C. § 1983; the Fourth Amendment and Fourteenth Amendments of the United States Constitution, Title VI of the Civil Rights Act of 1964, U.S.C. §2000(d), and the Constitution and laws of the State of New York;

b)     Award compensatory and punitive damages;

c)     Order reasonable attorneys' fees and costs to be paid by Defendants pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 1920; and

d)     Grant such other and further relief as the Court deems just and equitable.

## JURY TRIAL DEMANDED

Pursuant to the Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues triable by jury.

Dated:  May 14, 2013
        New York, New York

Latham & Watkins LLP

Benton J. Campbell
Howard G. Baker
Kelli G. Sussman
Jessica D. Rostoker
885 Third Avenue
New York, NY 10022
(212) 906-1200

*-and-*

The Legal Aid Society of New York

Steven Wasserman
199 Water Street, 6th Floor
New York, NY 10038
(212) 577-3300

*Counsel for Plaintiff Michael Parr*